**FORT WORTH GAS CO. v. CITY OF FORT WORTH et al.**

District Court, N. D. Texas, Fort Worth Division. November 5, 1929.

No. 542.

744

Slay, Simon & Shannon and Thompson & Barwise, all of Fort Worth, Tex., and Karl F. Griffith, of Dallas, Tex., for complainant.

R. E. Rouer, of Fort Worth, Tex., and F. G. Coates, of Houston, Tex., for respondents.

Before FOSTER, Circuit Judge, and ATWELL and DAWKINS, District Judges.

ATWELL, District Judge. On June 9, 1920, the gas company and the city of Fort Worth contracted that the rate for domestic gas should be 75 cents per M cubic feet, less a discount of 10 per cent. for prompt payment. On August 11, 1927, the company applied to the proper officials of the city for an increase, accompanying such application by a schedule of proposed rates. The city did not act upon the application within 60 days, nor thereafter, and on the 19th day of January, 1928, the company appealed to the Railroad Commission of Texas, which body has jurisdiction to fix rates charged by such utilities. Article 6058, R. S. of Tex. 1925. On July 16, 1928, after a full hearing, the commission denied the application and found that the rate base of the company for the year 1928 was $4,000,000, and that the rates under which the company was operating enabled it to earn 9 per cent. thereon, which afforded 2 per cent. for a depreciation reserve and 7 per cent. compensation.

The gas company came into court to enjoin the city from interfering with its desired increase. The District Judge denied restraint. After the action of the Railroad Commission, this three-judge court denied a preliminary injunction upon an amended bill, which alleged that the rates were confiscatory. Reference was made to a master, charged to take testimony and report findings and legal conclusions.

In 1909 the company, which had theretofore been a distributor of artificial gas, made a contract with the Lone Star Gas Company, expiring January 1, 1930, for natural gas. In 1924 the company's stock was taken over by the Lone Star Gas Corporation, which also holds 99 per cent. of the stock of the Lone Star Gas Company. This is legally uninteresting, because at the time of the making of the contract the stock was not so merged.

The reference was for the purpose of assisting the court to make specific findings as to value, reasonable rate of return, and net earnings. Value and net earnings, instead of being elusive and difficult of discovery, should await, merely, the calculation of the reliable auditor. Books should not be riddles. They should be photographs of that which has actually happened. The quandary of the student of rates is the resultant of the intricacies, and difficulties often, of the books. After value and net earnings have been discovered, a reasonable rate of return is as simple as the turning of the next page.

After taking testimony for five months, the master found the fair value of the company's plants, property, and business, on January 1, 1928, to be $3,846,878.10, and for the year 1928, $4,134,378.10. He found that 2 per cent. thereon is a reasonable depreciation reserve and that 7 per cent. is not confiscatory.

In reaching the rate base, the parties offered testimony covering the years 1923 to 1927, inclusive, during which period the return to the company was in excess of 10 per cent. Evidence was also offered covering the year 1928, ending June 30, and the same year ending September 30, which showed that less than 9 per cent. on the rate base had been available for return and depreciation. Evidence also disclosed that for the calendar year 1928 the amount available for depreciation and return was less than 9 per cent. Such diminution was not due to a loss of gross revenue, nor to a change in price levels, but was due to an unusually large increase in capital additions, and in the ratio of expenses to revenues.

The commission excluded 1927 in its determining the 2 and 7 per cent. return, on the ground that there had been less consumption of gas, by reason of the mildness of the winter, than usual, and that the year was therefore abnormal. The master excluded the year 1928, because he found that it was abnormal in capital additions and expense increase. If either or both years are considered, the finding of the commission and the conclusion of the master are faulty, and the result would be a confiscation of the plaintiff's property, within the meaning of the national constitutional guaranty.

■ A rate depends upon the property value at the time of the effective date of the order and for a reasonable time thereafter. The present and the future must be considered. The court's eye is fixed upon permanent levels, and not minor fluctuations. Having

reached figures that give the present value the past is finished. The rise or fall in the value is the fortune of the owners, and that the present value is greater than the original cost is immaterial. Cost, plus betterments, less depreciation, is only a rule for the purpose of getting at a present value, and is not proof of it beyond refutation. As an illustration of the wilderness in which the experts wandered in their quest for facts, we may cite some of their differences. For the company, Connor found entire reproduction cost new to be $6,252,387, and reproduction cost new, less depreciation, $5,631,610; Smith and Biddison, on the same side, and under the same heads, figured, respectively, $6,979,362, $6,297,976, $6,555,618, and $6,045,423; while Black and Learned and Bowen, for the city, under the same heads, found, respectively, $3,925,967, $3,484,051, $4,016,733, $3,564,103, $3,914,334, and $3,426,570. The master found $4,314,600.75 and $3,846,878.10.

There entered into these findings 30 different articles, namely:

(1) Land;
(2) Structures;
(3) Steel and C. I. mains;
(4) Main line fittings;
(5) Services;
(6) Paving over mains and services;
(7) Concrete and gravel backfill;
(8) Steam and interurban crossings;
(9) Street railroad crossings;
(10) Measuring stations;
(11) District regulator stations;
(12) Industrial meter installations;
(13) Special domestic installations;
(14) Domestic meters in service;
(15) Meter boxes and fittings;
(16) Transportation equipment;
(17) Office furniture and fixtures;
(18) Shop and garage.

(These first 18 comprising the physical property, except materials and supplies, and meters in stock, which aggregate, according to Connor, Smith, and Biddison, respectively, the company's witnesses, $4,300,927.17, $4,414,925, and $4,480,242.38; and according to the three city witnesses, Black, Learned, and Bowen, respectively, $3,247,500, $3,235,916.93, and $3,198,656; and according to the master, $3,524,583.30.)

(19) Engineering and supervision;
(20) Administration and legal;
(21) Preliminary and organization;
(22) Interest during construction;
(23) Taxes during construction;
(24) Omissions and contingencies;
(25) Materials and supplies;
(26) Meters in stock;
(27) Working capital;
(28) Going value;
(29) Salvage on pipe not in use;
(30) Cost of obtaining capital.

In a footnote [1] the exact figures of each of the witnesses, together with the master's findings, after having heard such witnesses, are shown.

The figures of the master, resulting from the testimony under these 30 heads, are attacked by the company under the first, third, fifth, sixth, seventh, twenty-first, twenty-second, twenty-third, twenty-seventh, twenty-eighth, and thirtieth headings, by exceptions. These exceptions are directed at both fact and law. The exceptions at fact findings are five in number, and there are two at legal findings. These exceptions refer to the numbers given by the master to his findings of fact and to his conclusions of law. There were 17 findings under the first head and 3 under the second. The exceptions are directed at the tenth, eleventh, thirteenth, sixteenth, and seventeenth findings of fact, and to the first and second conclusions of law. These findings are as follows:

(10) "I further find from the testimony adduced before me that the fair value of the company's public service plant, property, and business, on January 1, 1928, was $3,846,878.10, and that the average fair value thereof for the year 1928 was $4,134,378.10."

(11) "I further find that 2 per cent. of the fair value of its public service plant, property, and business is a reasonable annual charge for depreciation reserve, and is sufficient to enable the company to maintain its property intact."

(The company has made a mistake in excepting to the thirteenth finding, for as a matter of fact it is the twelfth finding to which it excepts.)

(12) "I further find that a rate of return of 7 per cent. on the fair value of the company's public service plant, property, and business, in the light of all of the circumstances, is not confiscatory."

(16) "I further find that the decrease in 1928 on the ratio which the amount available for depreciation and return bears to the fair value of the company's public service plant, property, and business was not due to diminution of gross revenue, nor to a change in price levels, but was due (a) to the unusually large increase in capital additions, which has not yet been productive of proportionate

---

[1] See note at end of case, pages 748 and 749.

increase in revenue; and (b) to an unusual increase in the ratio of expenses to revenue."

(17) "I further find that the periods ending in 1928 and the calendar year 1928 are abnormal, for the reasons mentioned, and are not as reliable a criterion of the sufficiency of the existing rates as the years immediately preceding."

First conclusion of law: "That the existing rate for domestic gas as established by the contract of June 9, 1920, is sufficient to enable the company to earn a reasonable return upon the fair value of its public service plant, property, and business, over and above its expenses, and the annual charge for depreciation required to maintain its property intact."

Second conclusion of law: "That the injunction prayed for by complainant should not issue."

A careful study of the record results in a support of the master's judgment as to the ultimate effect of weighing and determining the value of the testimony. This was his province. There is ample testimony for the support of his findings, and no legal fault may be found therewith.

We may accept the percentages of returns as approved by the commission, and found by the master, of 2 and 7 per cent., even though the commission had theretofore considered 8 per cent. as an appropriate return for gas utilities. We may even accept the suggestion, made in the sixteenth and seventeenth findings, that the 1928 expenditures were larger than usual, and that the 1927 gas consumption was less than usual, and be compelled to sustain the exceptions as to a part of finding 16 and 17. Perhaps, if we acted only upon the exceptions, we should be compelled to overrule them; but it is patent that the master was in error, and, as we think, the commission was in error, in excluding the years 1927 and 1928.

A rate that is legally and financially sufficient may, by a change in conditions, become insufficient and illegal, or confiscatory. Galveston Electric Co. v. Galveston, 258 U. S. 400, 42 S. Ct. 351, 66 L. Ed. 678; Bluefield Waterworks v. Public Service Commission, 262 U. S. 693, 43 S. Ct. 675, 67 L. Ed. 1176. When a rate has proven satisfactory, and has been remunerative during a series of years, and the evidence shows a complete change in management and an unusual amount of expenditures immediately prior to an application for a higher rate, a court would not grant nor deny upon the experience of the past, but would be warranted in

carefully weighing the justification and the explanation for the change in both management and expenditure.

The years 1927 and 1928, characterized as abnormal, leave the mind to work, to some degree, in a prophetic field. The company has been receiving satisfactory remuneration through a long period of years. Gross revenues have been steadily increasing. The number of customers has steadily increased. The consumption of gas per capita, barring the slight reduction in 1927, has remained substantially the same. An honest and intelligent forecast, based on the city's growth and the necessity for a commensurate plant, seem to legally justify the 1928 additions to capital. At any rate, the inferences to be drawn from the change of management and the bettering of the plant may be in harmony with the city's growth, rather than to assume that they were made for the purpose of affecting the decision of a rate-making body.

It is well established that in rate-making there is a strong presumption in favor of the conclusions reached by an experienced administrative body, after a final hearing, and such a body would be justified in ignoring a brief period of abnormality. Darnell v. Edwards, 244 U. S. 564, 37 S. Ct. 701, 61 L. Ed. 1317.

Accepting the exclusions of the master, we find an adjusted revenue for the year 1927 of $710,842.38, with an expense of $347,911.61, which left a balance of income for depreciation and return of $362,930.77, or 10.08 per cent. on a valuation, as fixed by him, of $3,600,651.58. Returning to his figures for the year ended June 30, 1928, we find a value for the property of $3,889,745.67, with a gross revenue of $742,345.22, and an expense of $396,546.86, which left a balance for income for depreciation and return of $327,798.36, or 8.43 per cent. on the total value, while the year 1928, ended September 30, gave the figures of $4,019,470.63 for value, $730,178.30 revenue, $408,428.01 expenses, which was 8.005 per cent. on the value.

Again, accepting the figures and findings of the master, we find the entire gross revenue for the year 1928 to be $751,615.28. The expenses for the same year show a large increase over those for prior years, even though there has not been an appropriate increase in income. Place them at the sum of $410,000. This leaves an estimated net revenue of $341,615.28. The capital additions during the same year, according to the witness Wright, were somewhere between $450,000 and $550,000, exclusive of the general shop build-

ing, which cost about $75,000. Placing capital additions for the year at $575,000, the total value of the property would be $4,-421,878.10. The estimated net income of $341,615.28 is 8.26 per cent. of $4,134,378.10, and 8.54 per cent. of the Railroad Commission's $4,000,000 base.

The plant has approximately 31,000 customers, of whom 2,312 were added in 1922, 1,144 in 1923, 1,905 in 1924, 946 in 1925, 2,154 in 1926, and 3,014 in 1927. The number added in 1928 is not given. In 1922 the consumption per customer was 81.7 M cubic feet; in 1923, 80.5 M cubic feet; in 1924, 80.8 M cubic feet; in 1925, 78.3 M cubic feet; in 1926, 81.3 M cubic feet; in 1927, 71.1 M cubic feet; in 1928, 77.64 M cubic feet. An addition of customers each year, with the largest period in 1927. These figures also show a decrease in consumption during the year following a large increase in customers.

Further illustration from actual figures of value, revenue, expense, and return seems useless. In the absence of a finding that money was deliberately peaked in useless investment, for the purpose of affecting a rate decision, the court would be unwarranted in ignoring such a display.

This court is not an appellate board for the making of rates. The end of the matter is a consideration as to whether it clearly appears that the Constitution of the United States has been infringed by some confiscatory rate. San Diego Land & Town Co. v. Jasper, 189 U. S. 446, 23 S. Ct. 571, 47 L. Ed. 892. A company is entitled to demand just compensation, and just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public. Board of Public Utility Com'rs v. New York Telephone Co., 271 U. S. 31, 46 S. Ct. 363, 70 L. Ed. 808; McCardle v. Indianapolis Water Co., 272 U. S. 408, 47 S. Ct. 144, 71 L. Ed. 316; San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 S. Ct. 804, 43 L. Ed. 1154.

It seems rather unfair to hold contrary to a rate-making body upon facts which, in part, at least, are entirely different from those offered to the court; but the law is that the present, as well as the future, must be regarded. It must be determined whether the rates complained of are yielding, and will yield, over and above the amount required to pay taxes and proper operating charges, a sum sufficient to constitute just compensation for the use of the property employed in furnishing the service. Such a rate is a reasonable rate of return, and must be made on the value of the property at the time of the investigation and for a reasonable time in the immediate future. McCardle Case, 272 U. S. 408, 47 S. Ct. 144, 71 L. Ed. 316.

The criticism of the company for having made a comparatively small valuation under oath to the taxing authorities may be overlooked, since we are accepting the figures about which there is no complaint by the city. It may be that the rendition of property for taxes is not technical evidence in a court; yet, when a court is passing upon the action of a rate-making body, it may be considered in determining whether that body acted fairly. This is particularly true, if the returns, as made by the utility, were sworn to by its officers. San Diego Land & Town Co. v. Jasper, 189 U. S. 443, 23 S. Ct. 571, 47 L. Ed. 892; Great Falls Gas Co. v. Public Service Commission (D. C.) 34 F.(2d) 297.

The master's method of calculating the amount of the annual depreciation is not impressive. It seems to us that the evidence as a whole supports the conclusion that the life expectancy of the physical property does not exceed 25 years. The property must be repaired from time to time, as parts thereof wear, and necessarily smaller mains must be replaced with larger, because of the increase in population. It is not likely that there will be any balance to fund. Consequently the company should be allowed to set up an annual depreciation of at least 4 per cent. on the value of the physical property, which means 3.6 per cent. on the rate base.

Considering the favorable situation of the plaintiff company, as found both by the Railroad Commission and the master, and which appears to be reasonably supported by the record, we are not prepared to say, as a matter of law, that a net return for compensation of 7 per cent. will amount to confiscation.

Plaintiff's exceptions to the eleventh, sixteenth, and seventeenth findings of fact will be sustained. There will be a decree restraining the respondents from interfering with the complainant in the institution and collection of reasonable rates for gas furnished to domestic consumers; respondents to pay all costs.

748

NOTE, see p. 745.

## I

### COMPARISON OF ENTIRE REPRODUCTION COST NEW—AND—REPRODUCTION COST NEW LESS DEPRECIATION
(Page 29, Master's Report).

| | Entire Reproduction Cost New | Reproduction Cost New Less Depreciation |
| --- | --- | --- |
| **For the Company** | | |
| Conner | $6,252,387.00 | $5,631,610.00 |
| Smith | 6,979,362.00 | 6,297,976.00 |
| Biddison | 6,555,618.00 | 6,045,423.00 |
| **For the City** | | |
| Black | 3,925,967.00 | 3,484,051.00 |
| Learned | 4,016,733.00 | 3,564,103.00 |
| Bowen | 3,914,334.00 | 3,426,570.00 |
| Master | 4,814,600.75 | 3,846,878.10 (see page 62). |

## II

### DETAIL OF VALUATION OF WITNESSES FOR THE COMPANY, FOR THE CITY, AND BY THE MASTER
(See page 128, Master's Report).

| | For the Company | | | For the City | | | MASTER'S REPORT (Page 31) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | CONNER | SMITH | BIDDISON | BLACK | LEARNED | BOWEN | |
| 1 *Land* Used & Useful | 81,589.21 | 81,589.00 | 81,589.21 | 54,220.00 | 48,970.08 | 54,407.00 | 55,957.83 |
| 2 Structures | 53,170.00 | 53,170.00 | 53,170.00 | 40,447.00 | 39,760.00 | 45,924.00 | 39,170.00 |
| 3 Steel & CI Mains | 2,736,709.47 | 2,873,976.00 | 2,882,453.37 | 2,018,957.00 | 1,945,434.90 | 2,012,749.00 | 2,144,887.85 |
| 4 Main Line Fittings | 109,613.44 | 100,614.00 | 108,486.53 | 26,644.00 | 109,339.69 | 45,638.66 | 104,395.51 |
| 5 Services | 379,551.50 | 439,167.00 | 413,323.19 | 258,919.00 | 265,103.81 | 238,282.00 | 319,100.74 |
| 6 Paving Over Mains and Services | 76,648.44 | 76,048.00 | 76,648.44 | | 49,324.50 | 52,354.00 | 63,878.10 |
| 7 Concrete and Gravel Backfill | 64,539.45 | | 15,317.63 | 6,610.77 | 7,851.20 | 10,062.41 | 10,062.41 |
| 8 Steam and Interurban Crossings | 15,517.87 | 15,518.00 | 17,547.92 | 7,407.00 | 6,878.72 | 6,527.00 | 7,407.00 |
| 9 Street RR Crossings | | | | 3,669.00 | 3,788.20 | 3,703.00 | 3,788.00 |
| 10 Measuring Stations | 15,632.13 | 15,632.00 | 15,490.81 | 12,751.00 | 11,041.97 | 12,751.00 | 13,883.00 |

Items 1 to 18 Copied from p. 128

Original Opinion

| Ref. | Item | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| or p. 158 Printed Opinion | 11 District Regulator Stations | 51,897.73 | 51,888.00 | 49,382.15 | 55,177.00 | 51,246.15 | 55,177.00 | 52,456.00 |
| | 12 Industrial Meter Installations | 106,109.19 | 106,109.00 | 104,888.11 | 96,014.00 | 103,030.12 | 96,014.00 | 101,943.50 |
| | 13 Special Domestic Installations | 6,290.42 | 6,290.42 | 6,362.48 | 5,856.00 | 6,076.17 | 5,856.00 | 6,121.50 |
| | 14 Domestic Meters in Service | 402,045.77 | 383,702.00 | 425,775.89 | 401,457.15 | 399,024.30 | 406,934.00 | 401,355.36 |
| | 15 Meter Boxes and Fittings | 109,241.26 | 100,244.00 | 124,457.08 | 105,535.00 | 92,665.83 | 105,535.00 | 107,795.50 |
| | 16 Transportation Equipment | 42,606.42 | 42,606.00 | 42,606.42 | 42,604.00 | 46,606.42 | 42,606.00 | 42,606.00 |
| | 17 Office Furniture and Fixtures | 24,812.66 | 24,813.00 | 24,812.66 | 24,813.00 | 24,812.66 | 24,813.00 | 24,813.00 |
| | 18 Shop and Garage | 24,962.21 | 24,962.00 | 24,962.21 | 39,840.00 | 24,962.21 | 24,962.00 | 24,962.00 |
| | TOTAL Physical Property except Materials and Supplies & Meters in Stock | $4,300,927.17 | 4,414,925.00 | 4,480,242.38 | 3,247,500.00 | 3,235,916.93 | 3,198,656.00 | 3,524,583.30 (Master's Report, page 262) |
| Items 19–23 Copied from p. 245 Original Opinion or p. 280 Printed Opinion | 19 Engineering & Supervision | 207,588.38 | 315,000.00 } 45,000.00 | 330,685.08 | 154,301.00 | 156,146.24 | 158,500.00 | 168,812.22 |
| | 20 Administration and Legal | 137,893.29 | 110,000.00 } | { 187,015.77 | 68,086.00 } | { 68,288.45 | 51,000.00 | 73,667.91 |
| | 21 Preliminary and Organization | 131,665.64 | 220,000.00 } | | | | 43,400.00 | 20,000.00 |
| | 22 Interest during Construction | 466,020.53 | 467,680.00 | 565,142.05 | 106,690.00 | 160,841.86 | 111,000.00 | 120,000.00 |
| | 23 Taxes during Construction | 98,749.23 | 57,420.00 | 102,761.83 | 32,475.00 | 32,582.76 | 37,400.00 | 32,475.00 |
| Val. Ex. | 24 Omissions and Contingencies | 63,116.45 | 63,116.45 | 63,116.45 | 86,959.00 | 32,359.00 | 56,800.00 | 82,828.38 (p. 36) |
| Val. Ex. | 25 Materials & Supplies | | | | | 86,861.00 | 25,578.49 | 24,810.90 (p. 36) |
| Val. Ex. | 26 Meters in Stock | | | | | | | |
| Op. p. 37 | 27 Working Capital | 150,000.00 | 150,000.00 | 140,000.00 | 50,000.00 | 55,000.00 | 52,000.00 | 66,874.89 (p. 39) |
| Op. p. 45 | 28 Going Value | 560,000.00 | 682,000.00 | 595,965.31 | 180,000.00 | 185,000.00 | 180,000.00 | 200,548.15 (p. 60) |
| Val. Ex. | 29 Salvage on Pipe not in Use | | | | | 3,737.00 | | |
| Val. Ex. | 30 Cost of Obtaining Capital | 111,615.43 | 430,000.00 | 116,855.94 | | | | |
| | GRAND TOTAL | 6,227,576.12 | 6,955,141.45 | 6,581,784.81 | 3,925,967.00 | 4,016,733.24 | 3,914,334.49 | 4,314,000.75 |

(NOTE—On page 127 the Master says, with reference to tabulation on the first eighteen items above shown: "It will be noted, in this connection, that the amounts shown in the tabulation just referred to do not in all cases conform to the amounts shown by the respective witnesses under the same headings in their exhibits. The reason for this has just been stated. I have endeavored to compare in this tabulation only comparable figures; and this has required some readjustments, not of the amounts shown in the witnesses' exhibits but of their classification.")